And that becomes very significant throughout the case. This case is one in which the government has conflated a lot of activities to make it appear that there is an offense which in fact it never was able to prove. And it had its strongest impact on this case in the selection of the base level of the sentencing guidelines. The sentencing guidelines provided that a conviction on a substantive count of sex trafficking by coercion was at a base level of 34. But without that enrichment, without that substantive offense, then the base level was 14. 20 levels. In this case, it had a dramatic effect on the guidelines. What do you do with Article 2x of the sentencing guidelines? Don't the guidelines generally provide that for conspiracy offenses you look to the guideline for the underlying offense, for the object offense of the conspiracy? That's the general thing, Your Honor. But in this case, there is a specific provision in the guideline itself as to where to look. The guideline says specifically, if you have a conviction on a substantive count, you go to this level. Anything else, you go to a lesser level. And the guidelines in 1B, 1.3, it says specifically that that presumption does not apply where the statute has done the provision. And I think the statute applies equally to a guideline. And that's exactly what the United States has found. And it's held in the law, and that is the case we cite, and also other courts around the country have agreed to that. Now, there are two circuits that have gone the other way, so we're going to be having a split in the circuits in this case. And this is an issue that this court has improved on. Of course, in this one, the district judge said, well, I'd come out in the same place anyway, which makes a certain amount of sense because it seems ridiculous that in a case where there is a conspiracy to engage in sex trafficking by violence, the guideline drops down to where it would be if there was no sex trafficking and no violence. That doesn't make any sense to me. Yes, but thankfully, now that judges have discretion again to make sense out of the places where there are anomalies, the judge can look at this and say, this doesn't make sense to me, and so I'm not going to do it. And the judge said, if I'm wrong about the way the guidelines work, then I would come out the same way because I'm coming below, my actual sentence is below the guideline that I think applies, but it is above the guideline that you think applies. And that's where I would come out one way or the other because it's the same conduct and the same considerations that I'm applying in deciding what the sentence should be. But Your Honor, here that difference is so dramatic. We're not engaging with a few. Normally, we're not in a few levels here. We're dealing with a sentence that's several times what it would have been under the lesser guideline. And I suggest to Your Honor that the proper rule would be that the judge has to start with a proper calculation of the guideline. But if the reason, excuse me, if the reason why the judge wants to give a different sentence than the guideline that you think applies is that actually the conduct is more analogous to the one that the judge, perhaps erroneously, thought applied in the first place, then it makes perfect sense that the sentence would be closer to that guideline than to the one that applies. There's nothing peculiar about saying if I started from a very low level, that low level doesn't make sense to me. And so I would wind up in the same place as it would under the more sensible guideline to apply anyway. Yeah, the Ninth Circuit has been known to be wrong. Not like this circuit, which is, this circuit, this circuit, this circuit's decisions may be wrong, but they're binding. The Ninth Circuit's decisions, right or wrong, are not binding. Now, this circuit has to move on. So you're about to reveal a decision. This circuit has to move on by any point. And Your Honor, in this circuit, any panel of this circuit, Your Honor, the sentence itself, we argue, is substantively unreasonable. That the sentence that was imposed on Mr. Rivera over 20 years is more consistent with sentences that were being imposed on people who engaged in much more broader conspiracies or criminal activity involving multiple people, involving minors. Mr. Rivera's activity, Your Honor, involved an adult woman who was a sex worker for years, and he didn't lure her into the business. She was already in the business. She approached him to work with him and to work with her. So it's not a situation, but yet what we see is we see the government saying, well, look at what happened to Ray Kelly. Look what happened to the other cases here. Would you make that sentence? Their criminal activity is much broader than what was imposed on Mr. Rivera, than what Mr. Rivera was accused of engaging in. And in fact, Your Honor, we argue that there wasn't even sufficient evidence to show any conspiracy here because he had a separate business from that that was being operated by Mr. Randall. Didn't he stand guard while Mr. Randall was beating the sex worker who worked for him? Didn't he have a gun to chase off that sex worker's family when she, when they attempted to rescue her? Didn't Mr. Randall drive Ms. Rodriguez to dates when Mr. Rivera was in prison? Aren't all of those evidence of concerted activity? Well, Your Honor, with regard to the firearms allegations, those aren't supported by the facts. Your Honor, Mr. Randall, Mr. Rivera was always armed. He was a drug dealer. He carried a weapon for his own protection. So he only used it for drugs, not to further the prostitution activity that he engaged in. That is not in regard to Mr. Randall, Your Honor. You know where I come from, if you're carrying a gun, you're carrying a gun. So if he's carrying a gun, maybe he's going to use it. He was carrying a gun until he was in a position where he thought it was about to be attacked by Ms. Perez's family. Aren't those just questions for the jury? The testimony is he went down when he had nothing to do with Ms. Perez, according to you, and nothing to do with Mr. Randall's business. He went down with his gun to confront the family members. No, they came to his house. They came to where he lived. He didn't go anywhere with a gun to confront family members. He lived in the same house with Mr. Randall and a number of other people. And Ms. Perez's family came to that house. He did not confront them with a gun until Ms. Perez's father left the house, went out to the car. And what did he have to do with that episode at all other than to associate himself with Mr. Randall to defend Mr. Randall's business? He was present in the house, Your Honor, but he lived. He wasn't there. That was the reason he was present. And he came out because some of the altercation he had proceeded to a point in which he thought— And a jury could not reasonably find that he made this his altercation. And you just said he went down, which is, I think, what I said, after the gentleman went down to the trunk of the car. I think I just called you over. He went out. He went out. He went out. He went outside the house to where that person was, right? He went out of the house to the front of the house. Yes. The other person was at the street. Yes, exactly. Exactly. I mean, why isn't this all a question for the jury as to what his intent was and what that association was? Your Honor, respectfully, we don't believe that that evidence is sufficient to make that judgment. All right. Thank you. You've got some rebuttal. Thank you. Mr. Wolfe? May it please the Court. My name is Daniel Wolfe. I'm an assistant United States attorney in the Southern District of New York. And I represent the government on this appeal. I also represent the government in the trial. Again, where the panel left off was the sufficiency of the evidence. The Court is correct that under the—particularly under the deferential standard—that this jury was well within its discretion to find the unreasonable doubt based on the evidence that was proper to it, that Mr. Rivera was a member of a sex-trafficking conspiracy. As Judge Lynch pointed out, Mr. Rivera surrendered a weapon and attacked family members of the victim that Mr. Randall was trafficking. Mr. Rivera helped guard outside of the motel room as Mr. Randall beat the victim. And also, when Mr. Randall's victim fled her confinement, she finally escaped with him and moved to the Bronx. Mr. Rivera and Mr. Randall had conversations over text messages, during which they acknowledged where Mr. Randall's victim was present and the efforts that the two of them had made to recruit her back to work for Mr. Randall. As Judge Engelmeyer felt, both in the context of denying post-trial and post-denial rule 33 motions, as well as at sentencing, this was a case about all of the earmarks of Mr. Rivera participating in a conspiracy, and the jury's finding on that fact was well supported. With respect to sentencing, as an initial matter, I would note that this Court need not reach the question— the legal question—regarding calculation of the guidelines that the defendant is putting forth, because, as Judge Engelmeyer stated quite clearly and unequivocally, after calculating the guidelines and after going through all of the 3553A arguments and announcing his sentence, Judge Engelmeyer made clear that the sentence he was imposing would have been the same, regardless of his guidelines calculation, and that his sentence was based on his consideration of the 3553A factors, as well as the facts, of which he was well aware, having sat through all of the pretrial proceedings and the trial in this case. If the Court, however, does desire to reach the issue of the procedural reasonableness of the sentence, Judge Engelmeyer's calculation was correct. As an initial matter, as we set forth in our brief, the Ninth Circuit's decision in the Wayland is an opposite. It dealt with facts that are not present here, that is, a conspiracy, the object of which was not to violate Section 1591b1. Here, the conspiracy has a right to encompass that crime. On those facts alone, the offense itself here should be very forward. But even putting Wayland aside, Judge Engelmeyer's calculation was correct, both because it was a straightforward application of Guideline 2x, but also because, as he recognized, the term offensive conviction, as it is used in the relevant guideline, is a term of art within the guidelines. It is defined in the guidelines to encompass the conduct at issue, not the specific crime at issue. Further, as the Third Circuit has pointed out, it would generate absurd results to conclude that the base offense level here should be 14, and that's for two reasons. One, the guideline provision that sets forth that the base offense level should be 34 is triggered to an offensive conviction under 18 U.S.C. Section 1591b. Section 1591b is a penalty provision, not a substance of provision. So if read in the way that defense counsel and the penalty counsel here would have to read that provision, it would never apply because, of course, one is never convicted solely of a penalty provision. Further, as the Third Circuit pointed out, this would lead to absurd results in the sense that one who is convicted of conspiring to engage in forced labor would end up with a lower guideline range than one who is convicted of conspiring to engage in sex trafficking. And as the Third Circuit pointed out, and I think we can all agree, that sex trafficking is a more pernicious form of forced labor trafficking. For all of those reasons, the District Court sentence was procedurally appropriate. Very briefly on the substance of appropriateness of the sentence, as Judge Odinghelmeyer held at the sentencing itself, he did compare this sentence to the conduct at issue as well as to other cases that defense counsel has raised, both on appeal and the District Court. And again, he found, based on the facts, as he knew them in the 35 particular case factors, that this was an appropriate, and I should note, below guidelines sentence. Regarding the other issues raised, the government respectfully rests on its papers. I'm otherwise happy to answer any questions the panel has. Thank you. Thank you. I think we can go over a number of points. I do want to mention one, just so Your Honor, is that the prosecutor has mentioned that Mr. Rivera engaged efforts to recruit Ms. Perez to come back to rejoin Mr. Randall's prostitution business. In fact, he repeatedly retold her that whatever decision she made, it was her decision. He wasn't telling her what to do. He was just telling her, conveying some messages to Mr. Randall, that he had this term and wanted her back. Your Honor, it's only when you take that in the context of the expert testimony, which we objected to, about the Stockholm Syndrome, that you can take a reading of that as being somehow trying to lure somebody back. But in plain language, you have to make your decision. The same thing goes for this idea of him standing guard outside the hotel room while Randall beat Perez. Mr. Rivera, there's nothing in the record that says that he was there to keep Ms. Perez from leaving, or that Ms. Perez was even aware that she didn't leave because he was standing outside. He didn't go into the room because he wasn't participating. In the assault that Mr. Randall was perpetrating at that point in time. Mr. Tamayo, it seems like you're offering alternative inferences that can be made from the evidence, but this all seems like these are factual issues that were in front of the jury. So certainly, there's one interpretation that the government put forward, and you're offering another one. But I don't see how that goes, too. I don't know if you're specifically addressing sufficiency at this point. Well, I was, Your Honor, in dealing with the sufficiency, and the inferences have to be reasonable. It's just not that the government has one theory and the defense has another. The inferences that are being drawn have to be based upon what the facts are. And the facts don't support the inference that, for instance, Mr. Rivera was outside the room with the weapon that he always had because he was standing guard. He was outside the room because he didn't go into the room. He wasn't part of that. And he was on because he was always on. So to take that and say he's standing guard just is an unreasonable inference from those facts in that space of opposition. Finally, Your Honor, on the issue of the unreasonableness of the penalty, as I indicated before, there are a lot of instances in the federal criminal code where penalties are less than reasonable hate crimes than they are for the act of a crime. And one we cited in the brief was a conspiracy to commit murder for the rapid hearing. It's a murder is committed... But they're actually usually the opposite, right? In fact, it's usually the case that where there is a... And it is the case with respect to this statute that Section 1594 provides that someone who conspires to commit one of the other offenses shall be punished in the same way as the substantive offense, right? Yes, Your Honor. And that's why that's said. The prosecutor indicated this penalty is an exception of Criminal Code. Okay, thank you. Go ahead. Thank you.